UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF WISCONSIN

---------------------------------------------------------------------------------------------

In re:                                                    Case No:  10-11787-7

CHAD L. PAWLAK and
JO ANN PAWLAK,

              Debtors.

---------------------------------------------------------------------------------------------

HOWARD D. WHITE, as TRUSTEE
of the CHAD L. PAWLAK and
JO ANN PAWLAK BANKRUPTCY ESTATE,

              Plaintiff,

v.                                                        Adv. No. 12-36

COYNE, SCHULTZ, BECKER & BAUER, S.C.,

              Defendant.


---------------------------------------------------------------------------------------------

MEMORANDUM DECISION

    This adversary proceeding was filed on February 29, 2012. In it, the chapter

7 trustee seeks to recover $50,000.00 the defendant received as compensation for

legal services. The trustee contends that the payment can be avoided as a

fraudulent transfer. The defendant denies this and filed a motion to dismiss on

March 23, 2012. The initial pretrial conference occurred on April 26, 2012. The

parties submitted a joint pre-trial statement and agreed that the motion to dismiss

would be heard in conjunction with the trustee's competing motion for summary

judgment, which was subsequently filed on May 4, 2012.[1] The matter has been

fully briefed. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (H),

and the Court has jurisdiction under 28 U.S.C. § 1334. The following constitutes

the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P.

7052.

**The Story Behind the Trustee's Complaint**

Chad Pawlak was once a member and employee of Organic Choice, a

limited liability company engaged in the sale of organic milk. After a dispute over

management of the company, in the fall of 2003 the other members terminated

both his employment and his membership. He sued the other members for alleged

breaches of fiduciary duty; they filed counterclaims. The other members obtained a

default judgment against him when his attorney did not file a timely answer, and his

own claims were subsequently dismissed. The state court entered a money

judgment against him for more than $1 million. Mr. Pawlak later sued his attorney

for malpractice and settled for $120,000.00. He offered the net proceeds to the

judgment creditors in satisfaction of their judgment, but they refused.[2]

---

[1] Because the defendant's motion to dismiss referenced matters outside the pleadings, it was treated as a motion for summary judgment under Fed. R. Civ. P. 12(d), as applicable in adversary proceedings pursuant to Fed. R. Bankr. P. 7012(b). The trustee was afforded the opportunity to file a cross-motion for summary judgment, which he did. The trustee also withdrew the claim that the payment of compensation constituted a preferential transfer, and the only remaining question is whether it is a fraudulent transfer under 11 U.S.C. § 548.

[2] For a full discussion of the underlying state court litigation and the related nondischargeability issues, see Organic Family, LLC v. Pawlak (In re Pawlak), 467 B.R. 462 (Bankr. W.D. Wis. 2012).

Given the standoff with the judgment creditors, the Pawlaks structured the

payout of the settlement proceeds in anticipation of a bankruptcy filing. The

malpractice insurance carrier paid most of the settlement proceeds directly to the

defendant. Pursuant to its contingency fee arrangement with the Pawlaks, the

defendant took $59,600.00 of the proceeds as compensation for its services in the

malpractice action. The defendant received another $55,400.00 to represent the

Pawlaks in any adversary proceeding filed by the other members of Organic

Choice. This sum included a $50,000.00 "flat fee" and an advance payment of

$5,400.00 for anticipated costs and expenses. The fee agreement between Mr.

Pawlak and the defendant provides as follows regarding the adversary proceeding

they expected to be filed:

> You have agreed to a flat fee of $50,000.00 for this service. This fee
> will cover the value of all work we will perform through the conclusion
> of the Adversary Proceeding. The fee will be paid by Liberty Mutual
> Insurance Company directly to us, and will be deposited in our
> business account. This fee is not an advance against any hourly rate,
> and the fee will not be billed against an hourly rate. You agree that the
> flat fee becomes the property of our firm upon receipt, and may be
> deposited into our business account.[3]

Of all the amounts paid to the defendant, the trustee only seeks to recover the

$50,000.00 flat fee.

The Pawlaks filed bankruptcy on March 12, 2010, less than a week after the

settlement of the malpractice action. The settlement - and the "direct funding" of

the Pawlaks' bankruptcy fees - was disclosed in their statement of financial affairs.

The payment of the $59,600.00 contingency fee was specifically described as a

---

[3] See Exhibit #2 to the trustee's motion for summary judgment.

"payment to creditors." In other areas (such as the paragraph devoted to other income and the paragraph which requires disclosures of transfers of "other property"), the debtors indicated that they personally received nothing from the malpractice settlement and that all of the proceeds went to fund the bankruptcy proceeding and the defense of an anticipated adversary proceeding. However, they did not list the actual amounts of that funding and did not list the $55,400.00 paid to the defendant under "payments related to debt counseling or bankruptcy," even though they *did* disclose the $5,000.00 paid to Michael Kepler, the debtors' principal bankruptcy attorney.[4]

The judgment creditors filed an adversary proceeding contesting the debtors' discharge on June 10, 2010. The defendant filed an answer on behalf of the Pawlaks. The trustee sent a letter to the defendant in October of 2010 requesting the cancellation of the debtors' fee agreement and the return of the fee to the bankruptcy estate. The defendant responded and asked the trustee to provide some "authority" to support his request. Apparently, the parties did not have any further discussion about the matter and the defendant continued its representation of the Pawlaks. The Court ultimately granted summary judgment to the Pawlaks on the nondischargeability complaint, and the trustee concedes that

---

[4] This $5,000.00 payment constituted the last remaining portion of the settlement proceeds.  In his disclosure of compensation form, Mr. Kepler disclosed that he would be compensated at a rate of $250.00 an hour for his services but did not specifically reference the fact that additional funds had been paid to him pre-petition. The defendant did not file an attorney compensation disclosure form until March 23, 2012. However, the parties agree that the fee arrangement was discussed at length during the meeting of creditors in May of 2010, and that the trustee received copies of the settlement agreement and flat fee retainer agreement in September of 2010.

4

the defendant was "extremely successful" in its representation.[5] However, the

trustee also contends that it was unreasonable for the defendant to rely upon the

fee agreement after he canceled it in October of 2010, and that the Pawlaks did

not get "reasonably equivalent value" at the time of the transfer.[6]

**What the Parties Want**

Both parties seek summary judgment. The trustee seeks to recover the

$50,000.00, while the defendant requests dismissal of the complaint. Summary

judgment is appropriate where there are no disputed issues of material fact and the

moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c).

Litigants frequently quibble over minor factual discrepancies, but summary

judgment is to be denied only if there is a "*genuine* issue of *material* fact."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d

202 (1986).  A material fact is one related to a disputed matter that might affect the

outcome of the action.  Id.  The Court's role is not to resolve factual issues, but to

grant summary judgment if there can be "but one reasonable conclusion."  Id. at

250. The summary judgment phase is not an opportunity to weigh the evidence or

attempt to ascertain the truth of disputed facts, but rather a time to decide whether

---

[5] In the dischargeability proceeding, the creditors raised claims under both 11 U.S.C. §§ 523 and 727. The Court initially dismissed a portion of the plaintiffs' second amended complaint (which was itself the subject of a briefed dispute as to whether the plaintiffs should be permitted to file it), and then resolved competing motions for summary judgment on the remaining claims in the debtors' favor.

[6] The parties agree that the defendant expended 381.20 hours of billable time on the dischargeability proceeding, and that on an hourly basis the actual cost of defense would have been over $88,000.00. The trustee does not believe these facts are relevant to a determination that the funding of the flat fee constituted a fraudulent transfer at the time it was made.

there is a genuine issue for trial.  <u>Franklin County Area Dev. Corp. v. Leos (In re</u>

<u>Leos)</u>, 462 B.R. 151, 154 (Bankr. M.D. Pa. 2011); <u>Grove v. Beaver (In re Beaver)</u>,

454 B.R. 184, 186 (Bankr. D.N.M. 2011).[7]

**Is a Flat Fee Property of the Bankruptcy Estate?**

As often happens, to find the answer one must begin at the beginning and

press on until the end. The filing of a bankruptcy case creates a bankruptcy estate

which is comprised of "all legal or equitable interests of the debtor in property as of

the commencement of the case." 11 U.S.C. § 541(a)(1). The scope of this

provision is broad and all encompassing, and it is to be construed to include

practically every conceivable interest the debtor might have as of the petition date.

<u>See</u> <u>Bracewell v. Kelley (In re Bracewell)</u>, 454 F.3d 1234 (11th Cir. 2006); <u>In re</u>

<u>Minton</u>, 348 B.R. 467 (Bankr. S.D. Ohio 2006); <u>Chappel v. Proctor (In re Chappel)</u>,

189 B.R. 489 (B.A.P. 9th Cir. 1995). The intent of the statute is to include all

property rights of the debtor, even if that interest is contingent or speculative. <u>In re</u>

<u>Hanley</u>, 305 B.R. 84 (Bankr. M.D. Fla. 2003); <u>Movitz v. Palmer (In re Palmer)</u>, 167

B.R. 579 (Bankr. D. Ariz. 1994).

At the same time, property interests are "created and defined by state law."

<u>Stern v. Marshall</u>, __ U.S. __, 131 S. Ct. 2594, 2616, 180 L. Ed. 2d 475 (2011)

(quoting <u>Travelers Cas. & Sur. Co. of Am. v. PG & E</u>, 549 U.S. 443, 451, 127

S. Ct. 1199, 167 L. Ed. 2d 178 (2007)); <u>see also</u> <u>Butner v. United States</u>, 440 U.S.

---

[7] Typically, of course, courts are instructed to view the facts in the light most favorable to the non-moving party. <u>Leos</u>, 462 B.R. at 154. In this case, the parties have essentially agreed upon the facts; the disagreement relates to the law applicable to those facts.

48, 54-55, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979) (the extent of a debtor's interest

in property is controlled by state law). The money the defendant received is

certainly property, but the question is what interest, if any, the Pawlaks had in that

money at the time of filing. The Pawlaks must have retained an interest in the

retainer for it to be property of the estate, and state law determines the respective

rights of the parties. In re King, 392 B.R. 62, 71 (Bankr. S.D.N.Y. 2008). Therefore,

part of the resolution lies in an understanding of the nature of the fee itself. In re

Blackburn, 448 B.R. 28, 35 (Bankr. D. Idaho 2011) ("To determine the extent of

Debtors' interest in the retainer at the time of filing, and thus the estate's interest,

the Court must first determine the nature of the retainer at issue.").

Wisconsin's rules of professional conduct for attorneys define the types of

fee arrangements attorneys may negotiate with their clients. An "advanced fee" is

an "amount paid to a lawyer in contemplation of future services," and is earned at

an agreed-upon basis (whether on an hourly rate, a flat fee, or another basis). See

SCR 20:1.0(ag). A "flat fee," however, is a "fixed amount paid to a lawyer for

specific, agreed-upon services," and is not directly connected to the time required

to perform the service. A flat fee "becomes the property of the lawyer upon

receipt." See SCR 20:1.0(dm). Finally, a "retainer" is defined as an amount paid

"specifically and solely to secure the availability of a lawyer to perform services on

behalf of a client," and does not constitute payment for specific legal services and

may not be billed against for fees or costs "at any point." See SCR 20:1.0(mn).

Like a flat fee, a retainer becomes the property of the lawyer upon receipt. Id.

In common parlance, of course, the term "retainer" is often used interchangeably in reference to *any* amount of money paid to an attorney at the outset of representation. Case law indicates that there are three general types of retainers: classic or true retainers, security retainers, and advance payment retainers. <u>Rus, Miliband & Smith, APC v. Yoo (In re Dick Cepek, Inc.)</u>, 339 B.R. 730, 736 (B.A.P. 9th Cir. 2006) (citing <u>In re Montgomery Drilling Co.</u>, 121 B.R. 32, 37 (Bankr. E.D. Cal. 1990)). The "classic" retainer is the type described in the Wisconsin rules of professional conduct: the payment of a sum of money to secure availability over a period of time. <u>Id.</u>, 339 B.R. at 736 n.5. The advance payment retainer occurs when the client pre-pays for expected services, and ownership of the funds is intended to pass to the attorney at the time of payment. <u>Id.</u> This is essentially what the Wisconsin rules describe as a "flat fee." And finally, the security retainer is one in which funds are held as security for payment of fees for future services. A security retainer remains the property of the *client* until the attorney applies it to charges for services actually rendered, and any unearned funds are returned to the client at the conclusion of the representation. <u>Id.</u> This appears to largely describe what the Wisconsin rules term an "advanced fee."

By definition, security retainers (or advanced fees) do not constitute present payment for future services; instead, the attorney simply holds the funds to secure payment in accordance with the Uniform Commercial Code (under which a security interest in money is perfected by taking possession of the collateral). <u>See</u> Wis. Stat. § 409.313(1); <u>In re Santiago</u>, No. 08-22666, 2011 WL 666286, at *2 (Bankr. D.N.J. Feb. 14, 2011) (attorney's receipt and retention of a retainer created a

8

possessory interest in the funds, making him a secured creditor). The attorney then bills against the collateral and earns fees on an ongoing basis. The client retains actual ownership of the funds until the attorney applies billed charges against the account, and any funds not earned by the attorney are returned to the client. To the extent that a security retainer remains unearned as of the petition date, courts typically consider the funds to be estate property. Blackburn, 448 B.R. at 38; see also Barron v. Countryman, 432 F.3d 590, 595 (5th Cir. 2005) (the debtor retains an interest in a security retainer until services are actually rendered, and the attorney merely "holds" the funds for the debtor); Fiegen Law Firm, P.C. v. Fokkena (In re On-Line Servs. Ltd.), 324 B.R. 342, 346 (B.A.P. 8th Cir. 2005) (money is property, and the debtor retains an interest in the balance of a security retainer because it has not yet been applied toward services actually rendered).

The fee agreement in this case provides for payment of a "flat fee" for representation in the dischargeability proceeding. Mr. Pawlak agreed that the fee became the defendant's property "upon receipt" in accordance with the Wisconsin rules governing attorney conduct. In addition, the funds were placed in the defendant's business account rather than its trust account. The fee agreement clearly reflects that this sum was the price of the defendant's representation of the Pawlaks through the "conclusion" of any adversary proceeding and that they would not be charged anything else.[8] The fee is therefore an "advance payment retainer," in which the client has pre-paid the attorney for expected services, and ownership

---

[8] Admittedly, there was a separate advance for costs, which the Pawlaks remained obligated to pay. The focus here is on the fee for legal services, not the incidental costs of litigation.

9

of the funds passes to the attorney at the time of payment. Under Wisconsin law, it is clear that the money no longer belonged to the debtors after it was paid to the defendant, which means it was not property of the estate at the time of filing. Blackburn, 448 B.R. at 38 (advance payment retainers "belong to the attorney when transferred" and are not property of the estate); Barron, 432 F.3d at 596 (funds collected as advance payment retainers do not become property of the bankruptcy estate); 3 Collier on Bankruptcy ¶ 328.02[3][b][ii] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (noting that ownership of an advance payment retainer passes at the time of payment in exchange for the commitment to provide the legal services).[9]

**Review and Regulation of Fees in Bankruptcy**

Before proceeding further, it is important to note that regardless of the nature of the fee under state law, the manner in which an attorney collects fees for services in bankruptcy is simultaneously regulated by the code. See Bethea v. Robert J. Adams & Assocs., 352 F.3d 1125, 1127 (7th Cir. 2003). Attorneys are obligated to file a statement with the bankruptcy court disclosing all compensation received during the year preceding the case or to be received in connection with the case. See 11 U.S.C. § 329(a). This requirement falls upon *any* attorney who represents a debtor "in" a bankruptcy case or "in connection with" such a case,

---

[9] Given this, the trustee's attempt to "cancel" the agreement in October of 2010 has little bearing on the outcome. The right to terminate an attorney's representation *of the debtor* is not property of the estate and may not be exercised by the trustee. Blackburn, 448 B.R. at 36 (rejecting trustee's attempt to terminate counsel as a mechanism to recover a retainer). Instead, the trustee must challenge the receipt (or retention) of a retainer on other grounds. Id.

even if the attorney does not apply for compensation from the estate. <u>Id.</u> Fees in

bankruptcy are subject to review for reasonableness, and an excessive fee is

subject to recoupment. <u>See</u> 11 U.S.C. § 329(b) (if compensation "exceeds the

reasonable value of any such services," the court may cancel the agreement or

order the return of any excessive payment).

The underlying purpose of the disclosure requirements was a congressional

concern that there might be the "potential for overreaching" by debtors' counsel. <u>In

re Nelson</u>, 424 B.R. 361, 364 (Bankr. N.D. Ill. 2009); <u>see also</u> <u>Law Offices of

Nicholas A. Franke v. Tiffany (In re Lewis)</u>, 113 F.3d 1040, 1045 (9th Cir. 1997) (the

bankruptcy code contains a number of provisions "designed to protect the debtor

from the debtor's attorney"). Courts have "a need and a right" to full, unfettered

disclosure of all fee and financial arrangements between debtors and their

attorneys. <u>Clements v. Early (In re Church)</u>, 438 B.R. 334, 343 (N.D. Ala. 2010)

(citing <u>In re New England Caterers, Inc.</u>, 115 B.R. 724, 728 (Bankr. D. Mass.

1989)). Full disclosure provides an opportunity for interested parties to review the

transactions and object to any unreasonable fees. <u>In re Whaley</u>, 282 B.R. 38, 41

(Bankr. M.D. Fla. 2002). As such, Fed. R. Bankr. P. 2016(b) directs that "[e]very

attorney for a debtor, whether or not the attorney applies for compensation, shall

file and transmit to the United States trustee within 14 days after the order for relief

. . . the statement required by § 329 of the Code." Rule 2017(a) indicates that the

court may, on the motion of a party or its own initiative, determine whether an

attorney received an "excessive" fee for bankruptcy-related services.[10]

In Lamie v. United States Tr., 540 U.S. 526, 124 S. Ct. 1023, 157 L. Ed. 2d

1024 (2004), the Supreme Court ruled that an attorney for a chapter 7 debtor may

not be compensated *from the estate* unless employed by the trustee with the

approval of the bankruptcy court. The Court rejected the argument that the

attorney for a corporate debtor could be paid for services rendered after the case

was converted from chapter 11 to chapter 7. The trustee's responsibility for

preserving the estate for the benefit of creditors justified limiting the ability of the

debtor's attorney to collect post-petition fees (thereby diminishing the estate) to

situations in which the trustee (and the court) had previously approved the

attorney's retention on behalf of the estate. Id. However, the Court also concluded

that:

> It appears to be routine for debtors to pay reasonable fees for legal
> services *before filing for bankruptcy* to ensure compliance with statutory
> requirements . . . . Section 330(a)(1) does not prevent a debtor from
> engaging counsel . . . and paying reasonable compensation in
> advance to ensure that the filing is in order.

124 S. Ct. at 1032 (emphasis added). While there is still some debate over the

limits of this so-called "retainer exception," it is fairly clear that it permits debtors to

pre-pay for bankruptcy services by a flat fee because those funds become the

---

[10] A full discussion of retention of attorneys and payment of compensation pursuant
to the bankruptcy code is beyond the scope of this decision. Suffice it to say that in
addition to the disclosure requirements, attorneys may also be required to seek court
approval of both their retention and their requested fees. Attorneys for chapter 7 debtors
are typically not subject to these additional requirements, with one caveat (which will be
discussed shortly). They are, however, obligated to *disclose* their fees, which remain
subject to scrutiny for reasonableness under § 329(b). Blackburn, 448 B.R. at 38 n.13.

attorney's property at the time of receipt (and are not property of the debtor's
subsequent bankruptcy estate). See Redmond v. Lentz & Clark, P.A. (In re
Wagers), 514 F.3d 1021, 1029-30 (10th Cir. 2007); Morse v. Ropes & Gray, LLP (In
re CK Liquidation Corp.), 343 B.R. 376, 383-84 (D. Mass. 2006).

The precise mechanics of how an attorney collects a retainer in a chapter 7
case is therefore often quite important in determining whether the attorney can
keep the money. For example, in Bethea, the attorneys negotiated a "retainer"
agreement with the debtors that provided for installment payments for bankruptcy
services. Some of the installments were due post-petition (and post-discharge).[11]
The debtors argued that the attorneys' subsequent collection efforts violated the
discharge injunction. The Seventh Circuit agreed, finding that the attorneys' claims
had been discharged and that they were not entitled to seek the balance of their
fees.  See 352 F.3d at 1127. Other cases also reflect the fact that an attorney
cannot collect part of a "retainer" after the petition is filed without first being
retained by the estate. See In re Waldo, 417 B.R. 854 (Bankr. E.D. Tenn. 2009)
(attorney's receipt of post-dated checks to be cashed post-petition for payment of
fees was impermissible). Likewise, attorneys who take a *security retainer* prior to
the filing of a chapter 7 may also run into problems given that the funds are still

---

[11] Perhaps the arrangement was better described as a "retention agreement" or
simply a "payment agreement," as it does not satisfy the principal characteristic of any of
the three general types of retainers: namely, that money is paid *in advance.*

13

property of the estate. <u>Wagers</u>, 514 F.3d at 1029-30; <u>CK Liquidation</u>, 343 B.R. at 384.[12]

 This case, of course, involves the payment of a flat fee; the funds became the defendant's property upon receipt and were not property of the estate at the time of the filing. Both <u>Lamie</u> and <u>Bethea</u> recognize that chapter 7 debtors often pre-pay for bankruptcy services. Some of those services occur before the petition is filed (consultation with the debtors, preparation of the petition and schedules, etc.) and some happen afterward (attendance at the meeting of creditors, the preparation of reaffirmation agreements, lien avoidance motions or other contested matters, and yes, on occasion, even representation in adversary proceedings). As long as a flat fee is paid entirely pre-petition, it does not run afoul of the bankruptcy code.  <u>Waldo</u>, 417 B.R. at 880; <u>see also</u> <u>Barron</u>, 432 F.3d at 597. As the Seventh Circuit recognized in <u>Bethea</u>, it is the "norm" in chapter 7 cases for an attorney to be paid in full, in advance, for the work associated with a bankruptcy filing. 352 F.3d at 1127. Getting paid in full and in advance avoids the retention and dischargeability issues which proved problematic in <u>Lamie</u> and <u>Bethea</u>, but it does not eliminate the need for full disclosure or the possibility that the fees may be found unreasonable or excessive under § 329(b). Those are issues the Court will now address.

---

[12]  Although the attorney may have a possessory security interest in a security retainer, there is a question as to whether these lien rights are sufficient to circumvent the <u>Lamie</u> decision. <u>See</u> <u>CK Liquidation</u>, 343 B.R. at 384 ("Where the Supreme Court has interpreted § 330(a)(1) as preventing payment from the debtor's estate to counsel not appointed under § 327, authorization of such payment on the basis of state law is forbidden by the Supremacy Clause."). Given the nature of the defendant's fee agreement with the debtor, this issue is not before the Court.

14

The trustee has not complained about the fact that the defendant did not file a compensation disclosure form within the time period contemplated by Rule 2016(b). Still, the fee disclosures are mandatory and courts place heavy emphasis on the duty to do so in a timely and comprehensive fashion. See In re Chez, 441 B.R. 724, 731 (Bankr. D. Conn. 2010). The obligation to disclose fees under § 329 is not limited to services in the main bankruptcy case. Attorneys are supposed to disclose all fees for services rendered "in contemplation of or in connection with" a case. See 11 U.S.C. § 329(a). That phrase has been broadly construed to encompass a variety of pre-petition legal services, even if not directly related to the bankruptcy filing itself. In re Perrine, 369 B.R. 571, 581; see also Brown v. Luker (In re Zepecki), 258 B.R. 719, 724 (B.A.P. 8th Cir. 2001), aff'd 277 F.3d 1041 (8th Cir. 2002) (the test is whether the debtor was "influenced by the possibility or imminence of a bankruptcy proceeding" when paying an attorney). It also includes fees for work in adversary proceedings, as they are clearly connected to the main bankruptcy case and "could not exist without it." Blackburn, 448 B.R. at 42.

The failure to adequately disclose can result in a variety of penalties, including the loss of the fee. Perrine, 369 B.R. at 586 (Bankr. C.D. Cal. 2007). At the same time, courts have "broad discretion" in designing appropriate remedies to deal with violations of § 329(a) and Rule 2016(b). Blackburn, 448 B.R. at 40; Waldo, 417 B.R. at 893; see also In re Parklex Assocs., Inc., 435 B.R. 195, 207 (Bankr. S.D.N.Y. 2010).[13] Even though the defendant did not file a statement of

---

[13] As the court noted in Parklex, noncompliance with the provisions governing compensation "can range from inadvertent, technical violations, which may call for the
(continued...)

15

compensation at the outset of the case, the fee arrangement was disclosed in the statement of financial affairs and was fully disclosed to the trustee. The defendant made no effort to conceal receipt of the fee, and it was discussed in great detail at the meeting of creditors. Under these circumstances, the Court finds insufficient reason to penalize the defendant. To the extent that the defendant did not satisfy the letter of the code and the rules in documenting its receipt of the fee, the Court finds it to be an inadvertent and technical violation rather than a willful disregard of the disclosure obligations. There is no evidence of an intent (or an effort) to conceal the nature and circumstances of the fee arrangement, which was freely disclosed and discussed on several occasions.

One of the concerns underlying the trustee's complaint appears to be the notion that the defendant could have ended up with the money for doing nothing at all. As the trustee has noted, the defendant took a sizable flat fee for services it *anticipated* rendering, but could not guarantee would be required. It was possible (though, as shall be seen shortly, highly unlikely) that the judgment creditors would receive notice of the Pawlaks' bankruptcy and simply abandon their claims. This worry is easily addressed, as it must always be remembered that the bankruptcy court's jurisdiction over fees is "paramount and exclusive." <u>Brown v. Gerdes</u>, 321

---

[13](...continued)
imposition of no sanction whatsoever, to intentional violations, which may warrant complete disgorgement of fees." 435 B.R. at 207 (citing <u>Vergos v. Mendes & Gonzales PLLC (In re McCrary and Dunlap Constr. Co., LLC)</u>, 79 Fed. Appx. 770, 779 (6th Cir. 2003)).

U.S. 178, 183-84, 64 S. Ct. 487, 88 L. Ed. 659 (1944).[14] To the extent a sizable flat

fee might be paid to debtor's counsel for representation in an adversary

proceeding that never materializes, the code provides its own remedy.

Under § 329(a) the attorney must disclose payment "for services rendered *or

to be rendered"* in connection with the case. The court may cancel the agreement

and order the return of the payment if "such compensation exceeds the reasonable

value of any such services." See 11 U.S.C. § 329(b). This review may take place at

any time during the pendency of the case (for example, after the deadline for filing

objections to discharge has passed) and is independent of the attorney's right to

the funds under state law.[15] An attorney who ended up doing nothing in exchange

for a sizable flat fee might technically be the owner of the money at the time of

filing, but the amount of compensation would inevitably face heavy scrutiny under

§ 329(b). In the present case, the trustee acknowledges that the defendant

invested far more than $50,000.00 in billable hours on the dischargeability

proceeding, and he does not suggest that the fee is excessive in light of the actual

services performed. Given that the actual services were worth at least the amount

paid (if not more), the regulatory aspects of the code are satisfied. Barron, 432

F.3d at 597 (a flat fee or advance payment retainer cannot be recouped if there is

---

[14] While Brown involved construction of the Bankruptcy Act of 1898, the
predecessor to the present bankruptcy code, the policy regarding bankruptcy court
supervision of compensation remains the same. See Lewis, 113 F.3d at 1045 (bankruptcy
court's authority to deny fees is "grounded in the inherent authority over the debtor's
attorney's compensation").

[15] Basically, state law may dictate that a pre-petition flat fee belongs to the attorney
and is not property of the bankruptcy estate under 11 U.S.C. § 541(a). But the attorney
might still have to give it back, whether under § 329(b) or another provision of the code.

"no issue as to their unreasonableness or nondisclosure under 11 U.S.C. § 329,"
and such retainers are outside the scope of § 330 since they are not property of
the estate).

**Was Payment of the Fee a Pre-petition Transfer of the Pawlaks' Property?**

Understanding the nature of the fee and recognizing that it did not become
property of the estate at the time of filing not does resolve the matter, of course,
because the bankruptcy code permits trustees to avoid (and recover) pre-petition
transfers of a debtor's property for a variety of reasons. Under § 548, transfers may
be avoided when they are found to be either actually or constructively fraudulent.
In their schedules and statement of financial affairs, it appears the debtors
attempted to preempt avoidance by disavowing any property right or interest in the
settlement funds.[16] But the underlying malpractice claim belonged to Mr. Pawlak,
and the settlement agreement's direct funding of the flat fee clearly constituted a
"transfer" of his property within the meaning of the bankruptcy code.[17] One need
look no further than the stipulated facts, in which the debtors acknowledge offering

---

[16] Specifically, the Statement of Financial Affairs provides:

Debtors received no proceeds from the malpractice lawsuit. Debtor [sic] had
no rights to or interest in the settlement proceeds, and the proceeds were
not debtors' property. The consideration for settlement of the malpractice
lawsuit was the direct funding by settling defendants of the attorney fees for
this bankruptcy proceeding; direct funding by the settling defendants of the
defense against adversary claims and anticipated costs; and direct payment
by the settling defendants of the 1/3 contingency fee and costs incurred in
the malpractice lawsuit.

See Question No. 10, Debtors' Statement of Financial Affairs.

[17] Under 11 U.S.C. § 101(54)(D), the term "transfer" means "each mode, direct or
indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with"
property or an interest in property.

18

the net proceeds to the judgment creditors before directing that they be paid to the

defendant, to see that the Pawlaks exercised dominion and control over the

settlement funds even if the money was not directly deposited into their bank

account. See § 548(a)(1) (the trustee may avoid the transfer "of an interest of the

debtor in property"); Nordberg v. Sanchez (In re Chase & Sandborn Corp.), 813

F.2d 1177, 1181 (11th Cir. 1987) (all funds under the control of the debtor,

"regardless of the source," are deemed to be the debtor's property); Kapila v. TD

Bank, N.A. (In re Pearlman), 460 B.R. 306 (Bankr. M.D. Fla. 2011) (control over

property has two components: the power to designate who will receive the funds

and the power to actually disburse the funds).[18]

The trustee does not argue that the debtors attempted to improperly hinder,

delay, or defraud creditors by pre-paying for legal services. Rather, the trustee

asserts that the transfer was *constructively* fraudulent under 11 U.S.C.

§ 548(a)(1)(B). In order to prove this, the trustee must show that there was a

transfer of the debtors' property within two years of the filing, that the debtors

"received less than a reasonably equivalent value" in exchange for the transfer,

and that the debtors were either insolvent on the date of the transfer or were

rendered insolvent as a result of it. See Williams v. City of Milwaukee (In re

---

[18] Put simply, Liberty Mutual was not going to disburse anything to the defendant until Mr. Pawlak signed the settlement agreement and authorized doing so. The defendant acknowledges that it was not entitled to the $50,000.00 for previous services, and nothing (other than legal strategy) obligated Mr. Pawlak to direct that the funds be delivered to the defendant rather than to his personal bank account. Regardless of the characterizations found in the statement of financial affairs, the reality is that he gave the defendant something that otherwise would have belonged to him in exchange for future legal services; that is a "transfer of an interest in property" within the meaning of the code.

Williams), __ B.R. __, 2012 WL 1906375, at *4 (Bankr. E.D. Wis. May 25, 2012);

Peterson v. Atradius Trade Credit Ins., Inc. (In re Lancelot Investors Fund, LP),

451 B.R. 833 (Bankr. N.D. Ill. 2011).

The undisputed facts demonstrate that the debtors indirectly transferred

$50,000.00 to the defendant less than a week before the bankruptcy petition was

filed, that the defendant received the transfer, and that the debtors were insolvent

(or were rendered insolvent) when the transfer was made. The only issue is

whether the defendant's promise to represent the debtors in an anticipated (but

unfiled) adversary proceeding constitutes "reasonably equivalent value." The

trustee argues that all the debtors got from the defendant at the time of the transfer

was a promise to represent them in an adversary proceeding which they could only

speculate *might* be filed by the judgment creditors. He believes that promise simply

wasn't worth $50,000.00. The defendant contends that it was because it was clear

at the time that the judgment creditors would fight the discharge of their claims.

The defendant points to the years of bitter litigation and the fact that the judgment

creditors rejected the offer of the net settlement proceeds in satisfaction of their

claim.[19] Despite this history, the trustee argues that it was impossible to put a value

on the promised representation at the time the transfer was made.

---

[19] As indicated in the Court's prior decision on dischargeability, Mr. Pawlak and the
judgment creditors held diametrically opposed recollections of the events which led to his
termination. See Pawlak, 467 B.R. at 466-67. The creditors were also clearly committed to
pursuing all available claims against the debtors and were not inclined to permit them an
easy - or undisputed - discharge.

**The Promise of Future Representation as Reasonably Equivalent Value**

The concept of "reasonably equivalent value" is not defined by the

bankruptcy code. See Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors

of R.M.L. (In re R.M.L.), 92 F.3d 139, 148 (3d Cir. 1996) (noting that Congress "left

to the courts the obligation of marking the scope and meaning" of the phrase). In

determining "reasonably equivalent value," courts typically compare the value of

the property transferred with the value of what the debtor received. Barber v.

Golden Seed Co., 129 F.3d 382, 386 (7th Cir. 1997); Bankeast v. Shirley (In re

Shirley), Nos. 10-3031 and 10-3032, 2011 WL 4054773, at *8 (Bankr. E.D. Tenn.

Sept. 12, 2011) (quoting Corzin v. Fordu (In re Fordu), 201 F.3d 693, 707 (6th Cir.

1999)). The exchange need not involve exact equality in value; it is enough for

there to be "rough" proximity. McCarthy v. 88 La Gorce, LLC (In re El-Atari), No.

11-1404, 2012 WL 404947, at *3 (Bankr. E.D. Va. Feb. 8, 2012); Kendall v. Carbatt

(In re Carbatt), 357 B.R. 553, 560 (Bankr. N.D. Cal. 2006).

Instead of a precise mathematical formula, courts look to the circumstances

of the particular case to determine whether the value of what the debtor received

falls within a reasonable range of equivalence. See Barber, 129 F.3d at 387

(reasonable equivalence should "depend on all the facts of each case"); VFB LLC

v. Campbell Soup Co., 482 F.3d 624, 631 (3d Cir. 2007) ("reasonably equivalent

value is not an esoteric concept: a party receives reasonably equivalent value for

what it gives up if it gets 'roughly the value it gave'"); Butler Aviation Int'l v. Whyte

(In re Fairchild Aircraft Corp.), 6 F.3d 1119, 1125-26 (5th Cir. 1993) (the debtor

"need not collect a dollar-for-dollar equivalent" in order to receive reasonably

equivalent value); <u>Lindquist v. JNG Corp. (In re Lindell)</u>, 334 B.R. 249, 256 (Bankr. D. Minn. 2005) (the determination of whether the debtor received reasonably equivalent value is "one of common sense, measured against market reality"). The purpose of § 548 is to ensure that the estate is not depleted by transfers which net the debtor little (or nothing). <u>Montoya v. Campos (In re Tarin)</u>, 454 B.R. 179, 183 (Bankr. D.N.M. 2011). However, in determining reasonably equivalent value, the focus is on what the *debtor* surrendered and what the *debtor* received, not what any third party (or creditor) might have gained or lost as a result of the transfer. <u>Id.</u>

As such, it is irrelevant (at least in this context) that the $50,000.00 might have gone to creditors rather than the defendant. The question is whether the Pawlaks got something worth about $50,000.00 from the defendant at the time of the transfer. From the trustee's perspective, all they got was a potentially empty promise of possible future legal services (based upon the mere *presumption* that an adversary proceeding would be filed). The debtors believe this promise had significant value, at least to them, as it constituted an ironclad assurance that they would have counsel if the judgment creditors continued their pursuit. The trustee does not believe this constitutes "value" within the meaning of the statute, and it must be acknowledged that there is some support for the trustee's position, at least under Wisconsin fraudulent transfer law.[20]

In a recent case, the Wisconsin Court of Appeals treated a client's assignment of a judgment lien to his attorney as constructively fraudulent. <u>See</u> <u>Law</u>

---

[20] Wisconsin's version of the Uniform Fraudulent Transfer Act is, in many respects, similar (or identical) to the bankruptcy code's fraudulent transfer provisions.

Offices of Charles B. Harris, S.C. v. United States Bank Nat'l Ass'n, N.D., 2009 WI

App 158, 321 Wis. 2d 748, 2009 WL 2929246 (2009) (unpublished disposition).[21]

The facts of Harris are rather unique, but the essential aspect (for purposes of *this*

case) is that the attorney was given an asset worth about $86,000.00. He was

owed about $17,000.00 in fees at the time of the transfer, and he promised to do

additional work on the client's behalf. The court affirmed the conclusion that the

client did not receive reasonably equivalent value, in part because the promise to

perform future legal services did not fit the definition of "value" under Wisconsin's

fraudulent transfer provisions. Id., 2009 WL 2929246, at *2.

"Value" under Wisconsin's fraudulent transfer statute specifically excludes

"an unperformed promise made otherwise than in the ordinary course of the

promisor's business to furnish support to the debtor or another person." See Wis.

Stat. § 242.03(1). The attorney in Harris argued that the client received value

because what was exchanged for the assignment was not a promise to perform

future legal services, but the actual performance of the services themselves.

Although the attorney characterized the assignment as an advance fee or a

security retainer, the court rejected this argument and found that there was "no

authority to support the idea that a transferee need only perform the promise

before the creditor attempts to void the transfer." Id., at *4.

The bankruptcy code provides a similar definition of "value" for purposes of

the fraudulent transfer statute. See 11 U.S.C. § 548(2)(A) (defining value as

---

[21] As an unpublished opinion issued after July 1, 2009, the decision in Harris may
be cited for "persuasive value." See Wis. R. App. P. 809.23(3).

"property, or satisfaction or securing of a present or antecedent debt of the debtor,
but does not include an unperformed promise to furnish support to the debtor"). As
one court noted, this means that reasonably equivalent value under § 548 typically
excludes "future considerations," at least to the extent not actually performed. Gray
v. Snyder, 704 F.2d 709, 711 (4th Cir. 1983). However, "value" *can* include
intangible or indirect benefits, even if such things are hard to quantify (such as
"goodwill, corporate synergy, a business opportunity, the continuation of a
business relationship, or some other intangible benefit"). See Gold v. Marquette
Univ. (In re Leonard), 454 B.R. 444, 457 (Bankr. E.D. Mich. 2011) (citing Lisle v.
John Wiley & Sons, Inc. (In re Wilkinson), 196 Fed. Appx. 337, No. 05-5744, 2006
WL 2380887 (6th Cir. Aug. 17, 2006)).

As the trustee contends, the critical time to consider is when the transfer
was made. Subsequent events should not affect whether reasonable value was
given, and courts typically ignore post-transfer appreciation or depreciation in
value. See Allard v. Flamingo Hilton (In re Chomakos), 69 F.3d 769, 770-71 (6th
Cir. 1995). But the prospect of a *possible* future gain may have present economic
value at the time of the transfer. For example, Chomakos involved a trustee's effort
to recoup the debtor's gambling losses, and the court noted that in jurisdictions in
which gambling is legal, the placing of a bet "gives rise to legally enforceable
contract rights." Id. at 771. At the time of the transfer (i.e., the placing of the bet),
those contract rights have economic value. Id. As the court observed:

> The property is not unlike futures contracts purchased on margin. The
> investor in futures may win big, or his position may be wiped out, but
> the contractual right to a payoff if the market happens to move the

24

right way at the right time constitutes a value reasonably equivalent to the money at risk.

Id.

As indicated previously, the reasonableness of the value must be determined by the facts and circumstances of the particular case. The notion that the prepayment of future legal services can *never* constitute reasonable value, however, must be rejected for the same reason discussed in Chomakos and Leonard. After receipt of the $50,000.00 flat fee, the defendant entered into a binding contract. It promised to represent the debtors in any future adversary proceeding, and that promise gave rise to legally enforceable contract rights.[22] While perhaps "intangible" in nature, the defendant's promise to supply future legal services was not an "unperformed promise to furnish support to the debtor," nor was it without any ascertainable economic value at the time of the transfer. Clearly, the promise of representation through the "conclusion" of any dischargeability proceeding constituted an economic benefit.  See Tarin, 454 B.R. at 182 (quoting In re 375 Park Ave. Assocs., 182 B.R. 690, 695-96 (Bankr. S.D.N.Y. 1995)) (the determination of reasonable value focuses on whether the debtor received an "economic benefit," either directly or indirectly). The only real question is whether that value could objectively be characterized as roughly comparable to what the debtors gave up.

---

[22] For example, if the defendant later refused to represent the debtors or balked once the hourly fees exceeded the flat fee, the debtors would have had a cause of action for breach of contract.

25

Acknowledging that future legal services have "value" is also consistent with

the notion that flat fees (or prepayment of fees) for bankruptcy services is

permissible, subject only to review for reasonableness. In <u>Lamie</u>, the Supreme

Court ruled that an attorney for a chapter 7 debtor may not be compensated *from

the estate* unless employed by the trustee with the approval of the bankruptcy

court. However, the Court also concluded that debtors could *pre-pay* for legal

services in advance without running afoul of the code. <u>See</u> 124 S. Ct. at 1032

(noting that this practice is "routine"). If, however, those future services could not

be considered as having *any* value at all, the routine system envisioned by the

Supreme Court would be rendered untenable and trustees would systematically

recoup the portion of pre-petition fees associated with post-petition services. This

does not happen because the future services have quantifiable value that can be

correlated to the amount paid for them.

The trustee's primary concern seems to be that at the time of the transfer it

was impossible for the parties to know whether the judgment creditors would

actually contest the debtors' discharge. To the trustee's way of thinking, the

debtors surrendered a sizable chunk of money in exchange for what could have

turned out to be an empty promise. But this risk is similar to the risk that one might

lose a bet (or an investment). It is also akin to the risk one assumes when

purchasing insurance (namely, that the prospect insured against does not occur).

The existence of risk is not itself determinative of value. Instead, it is simply a

factor to be considered when weighing the relative worth of what the debtors

acquired. As the court noted in <u>Chomakos</u>, the contractual right to receive value (in

that case, payment; in this case, future representation) is worth *something*.

Assessing the economic benefit associated with a promise to perform all legal

services through the "conclusion" of a dischargeability proceeding must

acknowledge the balancing of interests that go into calculating a flat fee.

Essentially, the law firm hopes to fairly assess the amount of time it might have to

invest in such a case, while the client hopes to secure full representation without

fear of spiraling costs should things "go bad."[23]

In certain cases the likelihood of an adversary proceeding might be minimal.

A debtor in such a case is unlikely to pay a sizable flat fee because the risk

outweighs any perceived reward. But in a case where a battle over discharge is

likely and the client may not have access to significant post-petition funds to pay

ongoing fees, the relative value of a flat fee arrangement increases, at least from

the client's perspective.[24] Here the uncontested facts illustrate that the underlying

litigation between the Pawlaks and the judgment creditors was bitter and

protracted. The judgment creditors rejected the Pawlaks' settlement proposals, and

given the nature of the judgment (which included damages for alleged breaches of

fiduciary duty), it was highly likely a bankruptcy filing would be followed by an

---

[23] Contingency fee arrangements reflect a similar balancing of risk and reward. The attorney takes the risk of receiving nothing, while the client potentially surrenders a larger portion of a favorable result. A contingency fee arrangement may end up benefitting one party more than the other in the end, but at the time the parties enter into the arrangement each believes the prospective value of what they might get is worth whatever they are giving up.

[24] The attorney may also value the assurance of the flat fee, not only because it avoids the possible headaches of collection but because of the present value associated with funds which are deemed to be the attorney's property upon receipt and therefore immediately available.

27

action contesting the debtors' right to a discharge. What the debtors received from

the defendant was a legally enforceable contract right to representation throughout

the end game of a legal dispute that had already dragged out for almost seven

years. To the Pawlaks, that assurance was well worth $50,000.00, because they

were balancing the risk (the potential "loss" of the money if no adversary were

filed) with the possible gain (full representation in a *highly probable* adversary

proceeding, regardless of the amount of attorney time actually expended).

What the Court really is asked to do in this case is assess the

reasonableness of the forecast of future events that took place in March of 2010 as

to both the likelihood of litigation and the calculation of potential fees. Even if the

Court must ignore subsequent events and focus solely on what the parties knew

(or believed) at the time of the transfer, it is clear that they made certain

presumptions. First, they believed an adversary proceeding was probably

inevitable.[25] Second, they anticipated that a trial might involve re-litigation of the

underlying issues, as well as the dispute over dischargeability. A dischargeability

case involving more than $1 million in potential liability for alleged breaches of

fiduciary duty owed to a sizable limited liability company features the prospect of

significant discovery as well as the prospect of a lengthy trial. The case would

probably involve numerous documents and a number of witnesses, not to mention

the possibility of legal research and briefing on a variety of issues. At an hourly rate

---

[25] The fee agreement reflects this belief as it described the underlying litigation,
noted that the defendant anticipated defending Mr. Pawlak "on the underlying merits," and
identified the "expected" venue of the case as Eau Claire. See Exhibit #2 to the plaintiff's
motion for summary judgment.

of $200.00 (hardly an outlandish rate), the flat fee represents 250 billable hours,

which is a *very* conservative estimate of what it would require to defend a

complicated case all the way to its "conclusion."

Considering the totality of the circumstances, it is clear that the Pawlaks

"bet" that an adversary proceeding would be filed and that it would take far more

than 250 billable hours to represent them. In exchange for their bet, they received

a commensurate economic benefit - namely, the guarantee of representation

throughout that proceeding no matter how many billable hours might be involved.

The facts reflect that an adversary proceeding was likely, and the forecast of

probable defense costs was certainly well within a reasonable range (and probably

on the low end). When the likely cost of protracted litigation is combined with the

high probability that motivated creditors would pursue nondischargeability claims,

the debtors clearly received significant "value" from the defendant. On these facts,

the defendant's binding commitment to represent them was certainly worth roughly

what the Pawlaks surrendered in order to get it. As such, the Pawlaks received

"reasonably equivalent value" for the transfer they made to the defendant, and the

trustee cannot avoid the transfer under § 548. A judgment shall be entered in

accordance with this decision.

Dated: August 29, 2012

BY THE COURT:

/s/ Thomas S. Utschig

_____

Hon. Thomas S. Utschig
United States Bankruptcy Judge